

# IN THE
# TENTH COURT OF APPEALS

**No. 10-07-00129-CR**
**No. 10-07-00130-CR**
**No. 10-07-00131-CR**
**No. 10-07-00132-CR**
**No. 10-07-00133-CR**
**No. 10-07-00134-CR**

**AMOS W. JACKSON,**

                                        **Appellant**

 **v.**

**THE STATE OF TEXAS,**

                                        **Appellee**

---

**From the 52nd District Court**
**Coryell County, Texas**
**Trial Court Nos. 18,090; 18,091; 18,092;**
**18,093; 18,095; and 18,096**

---

## MEMORANDUM OPINION

---

Amos W. Jackson was charged with three counts of aggravated sexual assault and three counts of indecency with a child. A jury convicted him of all six counts and sentenced him to forty years in prison and a $10,000 fine on each of the assault counts and ten years in prison and a $10,000 fine on each of the indecency counts. Jackson

challenges: (1) the trial court's failure to require the State to make an election as to each offense; (2) the denial of his motion to quash the indictments; and (3) his ability to hear the evidence against him or confront witnesses because of a hearing impairment. We affirm.

## FACTUAL BACKGROUND

Brenda Daniels,[1] Jackson's step-daughter, testified that, beginning in fifth grade, Jackson "bump[ed] certain places," such as her breasts and "between the crease in [her] legs," while tickling or wrestling with her. This occurred in the living room and happened a lot. No particular incident stood out in her mind.

When Brenda was in sixth grade, Jackson began placing his hands on her breasts and vaginal area. He also forced Brenda to touch his penis over his clothing. When this happened, Brenda felt a "little lump." This "just kind of escalated from there to actually going under his clothes and actually touching his penis." This occurred once in her mother's bedroom and the other times occurred in her own bedroom or the living room. Before every act, Jackson made Brenda promise that she would not tell anyone. No particular incident stood out in her mind.

Jackson eventually made Brenda place her mouth on his penis. He told her not to tell anyone or they would get into trouble. Brenda testified that "once [he] started like it just kept going." She could not recall whether Jackson was laying down, standing, or clothed. Her "pants would be down to [her] knees." Jackson experienced

---

[1]    "Brenda Daniels" is a pseudonym.

an erection during these acts. These acts occurred in her bedroom or the living room and lasted a couple minutes. No particular incident stood out in her mind.

Jackson also placed his mouth on Brenda's vagina and would "feel around with his mouth and stuff." These acts occurred in Brenda's bedroom. Her pants would be pulled down. She did not recall whether Jackson was clothed.

Brenda further testified that Jackson penetrated her vagina with his finger. If her mother was at home, this would happen while Jackson and Brenda were driving in the car from one side of their property to the other. These acts also occurred in the living room or Brenda's bedroom. Both Jackson and Brenda were clothed during these acts, but Brenda's pants would be unbuttoned and unzipped. Jackson placed his hand down Brenda's pants and under her underwear. He seemed to enjoy what he was doing. No particular incident stood out in her mind.

All of the above described acts occurred during the day, when Brenda and Jackson were home alone, and took place a couple of times a week. The abuse began in sixth grade and continued through Brenda's eighth grade year of school.[2]

Jackson was charged with aggravated sexual assault by penetrating Brenda's (1) mouth with his sexual organ; (2) sexual organ with his mouth; and (3) sexual organ with his finger. He was further charged with indecency by: (1) touching Brenda's breast; (2) touching Brenda's genitals; and (3) causing Brenda to touch his genitals.

---

[2]     Brenda also testified that, on two occasions, Jackson made her watch a pornographic film. When Brenda was in eighth grade, Jackson attempted to penetrate her vagina with his penis on two occasions, once in the fall of 2004 and once in April 2005. Both acts occurred in Brenda's bedroom. She and Jackson were unclothed. Jackson was not charged with penetrating Brenda's sexual organ with his sexual organ.

**ELECTION**

In his first issue, Jackson argues that the trial court erred by not requiring the State to elect the acts upon which it intended to rely for conviction.

After the State rested, Jackson requested that the State elect the acts upon which it would rely for each offense. The trial court responded, "prior to argument of counsel and preparation of the Charge, the State will elect." During the charge conference, Jackson objected that the charge failed to "specifically elect which event the State is relying on." Based on *Dixon v. State*, 201 S.W.3d 731 (Tex. Crim. App. 2006), the trial court overruled the objection because "where there are numerous occasions alleged and no specific date given in the testimony, [] it is virtually impossible to elect a specific incident, and the Court has required a unanimity finding in each case."

Under the general rule, when "one act of intercourse is alleged in the indictment and more than one act of intercourse is shown by the evidence in a sexual assault trial, the State must elect the act upon which it would rely for conviction." *O'Neal v. State*, 746 S.W.2d 769, 771 (Tex. Crim. App. 1988); *see Phillips v. State*, 193 S.W.3d 904, 909-10 (Tex. Crim. App. 2006). Before the State rests, the trial court has discretion in directing the State to make an election. *O'Neal*, 746 S.W.2d at 771. Once the State rests its case in chief, upon a timely request by the defendant, the trial court must order the State to make an election and failure to do so is error. *Phillips*, 193 S.W.3d at 909.

The parties do not dispute that the evidence shows that each offense occurred on multiple occasions. However, the State argues that Jackson's request for an election was untimely because it came during the charge conference. We disagree. The day before

the charge conference, the State rested subject to rulings on the admissibility of evidence. After those rulings were made, Jackson requested an election. His request was timely. *See Phillips*, 193 S.W.3d at 909.

The State also argues that no election was required because an exception to the general rule applies where "several acts of sexual abuse are committed by one continuous act that was part of the same transaction." According to the State, the continuous sexual abuse offense reflects the Legislature's belief that "cases of repeated sexual abuse often fall into the category where no election should be required." *See* TEX. PEN. CODE ANN. § 21.02 (Vernon Supp. 2008). However, this section was not effective until September 2007. *See* Act of May 18, 2007, 80th Leg., R.S., ch. 593, art. 1, § 1.17, 2007 Tex. Gen. Laws 1120, 1127-28. Jackson's trial took place in April 2007.

In *Phillips*, the Court of Criminal Appeals considered a similar argument. Relying in part on *Steele v. State*, 523 S.W.2d 685 (Tex. Crim. App. 1975), the State argued that it "was not required to elect because the facts adduced showed only one continuous course of conduct or transaction." *Phillips*, 193 S.W.3d at 910. The Court of Criminal Appeals rejected this argument:

> …*Steele* applies only where the evidence shows that several acts of intercourse were committed by one continuous act of force and threats that are "part and parcel of the same criminal transaction." In *Steele*, unlike in the cases presently before us, two acts of intercourse occurred approximately two hours and twenty miles apart. The logic of *Steele* is hardly applicable to the facts before us, in which the complainants were molested at different locations over a period of months or years.

*Id*. at 910-11. As in *Phillips*, we are not persuaded by the State's argument. Because each indictment alleged one offense, but the evidence showed that each offense occurred

more than once, the trial court erred by failing to instruct the State to elect. *See O'Neal*, 746 S.W.2d at 771; *see also Phillips*, 193 S.W.3d at 909-10.

We must now decide whether the error contributed to Jackson's conviction or punishment. *See Dixon*, 201 S.W.3d at 734-36; *see also Phillips*, 193 S.W.3d at 913. Harm is determined by analyzing the four purposes of the election rule: (1) to protect the accused from the introduction of extraneous offenses; (2) to minimize the risk that the jury might choose to convict, not because one or more crimes were proved beyond a reasonable doubt, but because all of them together convinced the jury the defendant was guilty; (3) to ensure unanimous verdicts, that is, all of the jurors agreeing that one specific incident, which constituted the offense charged in the indictment, occurred; and (4) to give the defendant notice of the particular offense the State intends to rely upon for prosecution and afford the defendant an opportunity to defend. *Phillips*, 193 S.W.3d at 910, 913-14; *Dixon*, 201 S.W.3d at 733-36.

**Protection from Extraneous Offenses**

Evidence of other crimes, wrongs, or acts committed by the defendant against the child victim is admissible for purposes of showing: (1) the state of mind of the defendant and the child; and (2) the previous and subsequent relationship between the defendant and the child. TEX. CODE CRIM. PROC. ANN. art. 38.37 (Vernon Supp. 2008). Jackson was not entitled to protection from evidence of extraneous offenses involving Brenda. *See id.*; *see also Dixon*, 201 S.W.3d at 734-35.

**Risk of Conviction**

"This case is not concerned with evidence of different activities from different sources that a jury might perceive to 'add up' to the defendant being guilty even though no individual offense was proven beyond a reasonable doubt." *Dixon*, 201 S.W.3d at 735. Rather, Brenda was the only source of the multiple offenses committed by Jackson, and she did not testify to a "number of varied incidents with differing details that might have incrementally added to the idea that the defendant must have done something to provoke the plethora of stories about his activities." *Id*. She provided a sequence of events that occurred for each offense and stated that these incidents occurred a couple times a week over a period of years. *See id.* She was either credible or she was not and the number of times that each offense occurred does not impact her credibility. *Id*. We cannot say that the jury convicted Jackson for any reason other than that each of the six offenses was proved beyond a reasonable doubt.

**Notice and Unanimity**

Citing *Phillips* and *Farr v. State*, 140 S.W.3d 895 (Tex. App.—Houston [14th Dist.] 2004), *aff'd* 193 S.W.3d 904 (Tex. Crim. App. 2006), Jackson focuses on the notice and unanimity purposes of the election rule.

In *Phillips*, the Court of Criminal Appeals considered two cases. *See Phillips*, 193 S.W.3d at 906. Phillips was convicted of three counts of sexual assault. *See Phillips v. State*, 130 S.W.3d 343, 347 (Tex. App.—Houston [14th Dist.] 2004), *aff'd* 193 S.W.3d 904 (Tex. Crim. App. 2006). On the first two counts, oral and digital penetration, the victim testified in detail about two specific instances, one that occurred at Phillips's apartment

and one that occurred at a hotel, as evidenced by a hotel receipt. *Id*. at 353. She also testified that these acts occurred often, at Phillips's apartment; no specific date was provided, but they may have occurred weekly. *Id*. On the third offense, penetration of the victim's mouth by Phillips's sexual organ, the victim testified in detail about one specific instance and "also testified generally that the activity continued at least intermittently from the summer of 2000 until the spring of 2001." *Id*. at 354. The trial court did not require the State to elect. *See id*. at 348-49.

The Fourteenth Court held that "clear testimony exist[ed] for two specific occurrences of both digital and oral penetration, along with further testimony--often vague on the date, much less vague on describing the acts--that they often occurred." *Id*. "[B]oth offenses were described in detail more than once; yet, it was completely unclear to the jury which act the State would rely upon for conviction." *Id*. "This would have allowed the jury to convict because some of the jurors relied on one offense and others relied on another." *Id*. at 354. As for the third offense, "the jury would have known the specific act on which the State relied" because the testimony revealed the details of one act performed at a hotel. *Id*. "As to other occurrences, the testimony was only that the behavior was repeated, without any detail as to how, exactly when, or where." *Id*. The Court reversed Phillips's convictions on the first two counts, but not the third. *See id*. at 358.

Farr was convicted of two counts of aggravated sexual assault. *See Farr*, 140 S.W.3d at 897. K.R. testified in detail about four specific acts of oral sex that occurred in the summer of 2001 and continued for several months. *Id*. She identified what

happened during each incident, where in the apartment each took place, and "a general time line of when the events occurred, sometimes indicating her age and grade in school, the time of year the incident took place, or the approximate amount of time that had passed since the previous incident." *Id*. at 900. K.R. also testified that Farr "digitally penetrate[d] her vagina 'every chance he got.'" *Id*. at 897. The trial court denied Farr's request for an election. *See id*. at 899.

As to the oral sex offense, the Fourteenth Court held that "it is unclear from the testimony which incident the jury may have relied upon to convict" because K.R. had testified in detail about four specific incidents. *Id*. at 900. This created the potential that the jury might "convict because some of the jurors relied upon one incident and others relied upon another." *Id*. As to the digital penetration offense, K.R. testified "only generally," stating that Farr "would penetrate her with his finger 'every chance he got'", which "occurred when her mother and her sister were in other rooms of the apartment." *Id*. at 901. "She could not recall how many times these incidents occurred, but stated that they did not occur in connection with the incidents of oral sex." *Id*. Due to the generality of these statements, the Court could not be certain that the error did not contribute to Farr's conviction. *Id*. It reversed Farr's convictions. *See id*.

On appeal, the Court of Criminal Appeals held that the Fourteenth Court applied the proper harm standard in both cases: "failure to require the State to elect upon timely request results in constitutional error, and that the court of appeals was indeed required to reverse the convictions unless it found beyond a reasonable doubt that the error did

not contribute to the convictions or had but slight effect." *Phillips*, 193 S.W.3d at 914. The Fourteenth Court's judgments were affirmed. *See id.*

*Dixon* and *Hulsey v. State*, 211 S.W.3d 853 (Tex. App.—Waco 2006, no pet.) also shed some light on this issue. In *Dixon*, the victim did not testify about one distinct, detailed incident, but "described the manner in which appellant sexually assaulted her and said that it occurred numerous times." *Dixon*, 201 S.W.3d at 734. Specifically, the victim "related a sequence of events that occurred every time appellant sexually assaulted her." *Id.* at 732. Dixon would undress, remove the victim's underwear, touch her "private parts" with his hand, and touch her "private parts" with his "private parts." *Id.* This occurred one hundred times and, with one exception, always occurred at night. *Id.* The victim provided no other details. *Id.* Thus, "*all* of the incidents presented in the case were presented with equal specificity, and, except for the fact that one incident occurred during the day, none of the incidents were distinguished in any manner from each other." *Id.* at 734. The Court of Criminal Appeals found "beyond a reasonable doubt that the error in failing to require an election did not contribute to appellant's conviction or punishment." *Id.* at 736.

In *Hulsey*, a jury convicted Hulsey of two counts of sexual assault, seven counts of indecency with a child by contact, and one count of indecency with a child by exposure. *See Hulsey*, 211 S.W.3d at 855. Latoya testified that when she was twelve or thirteen, Hulsey began getting in bed with her and would lie next to her. *Id.* at 856. He eventually began rubbing her breasts and genitals. *Id.* He did this every morning that he could when Latoya's mother was at work, more than ten times and so many times

that she could not remember how many. *Id*. Hulsey began having intercourse with Latoya when she was approximately fifteen. *Id*. Over about a two-year period, Hulsey sexually assaulted her more than fifty times and that the number may have been one hundred times, which is what she had told police. *Id*. Latoya's two sisters also saw Hulsey on top of Latoya. *Id*. Latoya did not testify to specific instances of sexual assaults or indecency. *Id*. at 855.

The trial court denied Hulsey's motion to require the State to elect. *Id*. Hulsey argued that this denial was error as to two counts of sexual assault and two counts of indecency by contact. *Id*. As to the two counts of indecency by contact with Latoya's genitals and breast, we found, beyond a reasonable doubt, that the trial court's failure to require the State to elect did not contribute to Hulsey's conviction or punishment because Latoya related a sequence of events that occurred every time Hulsey assaulted her and provided no other details. *Id*. at 856 (citing *Dixon*, 201 S.W.3d at 734-36). As to the two counts of sexual assault, a specific incident had been identified for each count; thus, it would have been clear as to which incidents the State was relying on for conviction. *Id*. at 857 (citing *Phillips*, 130 S.W.3d at 355).

Unlike the victims in *Phillips* and *Farr*, Brenda did not testify in detail about any specific incidents of charged conduct. Thus, the jurors were not given a choice of incidents from which to choose for conviction on each charged offense. Neither was Brenda's testimony as general as that of the victim in *Farr*. In *Farr*, K.R. merely testified that the particular offense occurred "every chance [Farr] got," that they were alone during the offense, and that the offenses did not occur during the incidents of oral sex.

Here, as to each offense, Brenda identified how the offenses occurred, the school year during which the offenses occurred, where the offenses occurred, what time of day the offenses occurred, and how often the offenses occurred. She also provided some details of what took place during each offense.

Like the victims in *Dixon* and *Hulsey*, Brenda described a sequence of events that occurred each time Jackson committed a particular offense. *See Dixon*, 201 S.W.3d at 732; *see also Hulsey*, 211 S.W.3d at 856. All the incidents for each offense were presented with equal specificity and, except for the fact that the offenses occurred in different locations in or around the home or their property, none of the incidents were distinguished in any manner from each other. *See Dixon*, 201 S.W.3d at 734.

Moreover, the unanimity requirement was emphasized during trial. In closing, defense counsel reminded the jury that: (1) the evidence consists of "assaults or indecencies going on over a long period of time"; (2) "before you can convict Amos [Jackson] of any one of these you've got to unanimously agree that the State has proved one transaction, one event, beyond a reasonable doubt"; (3) "if the case has been proven on any of these, you've got to agree on one event"; and (4) "you've got to agree on a specific event, that all of the elements of that particular charge are proved beyond a reasonable doubt on that particular case." In its jury charge, the trial court instructed the jury that before "reaching a verdict of guilty under any individual indictment tried in this trial, the jury must agree that all of the elements charged in the individual indictment under consideration occurred in a single incident in the manner alleged in

that individual indictment." We cannot say that Jackson was deprived of a unanimous verdict. *See Dixon*, 201 S.W.3d at 735; *see also Hulsey*, 211 S.W.3d at 856.

Neither can we say that Jackson was deprived of notice or an opportunity to defend against the particular offenses on which the State intended to rely for conviction. Other than the locations in the home where the offenses occurred, there was no distinction between Brenda's account of each offense. *See Dixon*, 201 S.W.3d at 736. Jackson was not deprived of notice or an opportunity to defend.

In summary, we find, beyond a reasonable doubt, that the trial court's failure to force the State to make an election did not contribute to Jackson's conviction or punishment. *See Dixon*, 201 S.W.3d at 734-36; *see also Hulsey*, 211 S.W.3d at 856. We overrule Jackson's first issue.

## MOTION TO QUASH

Jackson's second issue challenges the denial of his motion to quash the indictments. We review a trial court's ruling on a motion to quash an indictment for abuse of discretion. *State v. Flournoy*, 187 S.W.3d 621, 623 (Tex. App.—Houston [14th Dist.] 2006, no pet.).

Each indictment charged Jackson with committing an offense that occurred "on or about" a specific date. Jackson filed a motion to quash the indictments on grounds that each offense was alleged to have occurred more than once and "it is impossible to know which of the multiple offenses was the actual offense authorized by the Grand Jury for prosecution." The trial court denied the motion. On appeal, Jackson contends that he could not "determine that the offense for which he was convicted was the very

same event or set of facts indicted by the Grand Jury and that at least nine members of the Grand Jury returning this indictment agreed upon the same set of facts."

In *Weatherby v. State*, 61 S.W.3d 733 (Tex. App.—Fort Worth 2001, pet. ref'd), Weatherby was charged with two counts of aggravated sexual assault of a child. *See Weatherby*, 61 S.W.3d at 735. The first count alleged, "on or about December 24, 1998, aggravated sexual assault of S.W. by contact of her sexual organ to the mouth or sexual organ of appellant." *Id*. The second count alleged indecency with a child by contact of her breast or genitals, but the jury charge submitted this count as a lesser included offense of aggravated sexual assault. *Id*. The trial court denied Weatherby's motion to quash the indictment. *Id*. On appeal, Weatherby argued that "there was no way of knowing whether the grand jury indicted him on the same facts presented to the petit jury at trial" because the indictment did not (1) "specifically allege the incident that he was going to be tried for"; or (2) "specify the acts constituting the alleged offenses." *Id*. The Fort Worth Court noted that the "indictment tracked the language of the respective statutes" and that, pretrial, the State had elected a primary offense. *Id*. at 736. The trial court had "specifically asked the prosecutor whether that was the offense presented to the grand jury and the prosecutor responded that there was no evidence to the contrary." *Id*. Because there was no evidence that the "offenses presented to the grand jury differed from the offenses proved at trial, the trial court did not abuse its discretion." *Id*. (citing *Sledge v. State*, 953 S.W.2d 253, 256 (Tex. Crim. App. 1997)).

In *Sledge*, the indictment charged Sledge with "aggravated sexual assault and indecency with a child, alleging that the offenses occurred on or about August 31,

1988." *Sledge*, 953 S.W.2d at 254. Sledge filed a motion requesting notice of extraneous offenses. *Id*. In its response, the State listed "several instances of sexual abuse" and at the pre-trial hearing, the "State revealed that the conduct of appellant towards the victim had been continuous over several years." *Id*. At Sledge's request, the State elected to "proceed on two specifically described episodes which occurred when the child was ten and eleven, because those incidents were most clear in her mind." *Id*. On appeal, Sledge argued that "the question is whether the State may obtain a conviction by proof of a different act from the act upon which the grand jury indicted - - indeed by proof of an act which the State has labeled 'extraneous.'" *Id*. at 254. However, there was "no evidence that the testimony presented to the grand jury related to offenses other than those proven at trial." *Id*. at 256.

Although the State made elections in both *Weatherby* and *Sledge*, but no elections were made in this case, Brenda did not testify to any specific incidents from which the grand jurors could choose. There is simply no evidence that the "offenses presented to the grand jury differed from the offenses proved at trial." *Weatherby*, 61 S.W.3d at 736; *see Sledge*, 953 S.W.2d at 256. The trial court did not abuse its discretion by denying Jackson's motions to quash. *See Weatherby*, 61 S.W.3d at 736; *see also Sledge*, 953 S.W.2d at 256. We overrule Jackson's second issue.

**ABILITY TO HEAR THE EVIDENCE AND CONFRONT WITNESSES**

In issue three, Jackson contends that he could not hear the evidence presented at trial or confront the witnesses against him in violation of article 38.31 of the Code of

Criminal Procedure, the Sixth and Fourteenth Amendments of the United States Constitution, and article 1, section 10 of the Texas Constitution.

At trial, Jackson informed the trial court that he was having difficulty hearing the proceedings. The trial court obtained a set of headphones, which Jackson used for the remainder of trial. After trial, Jackson filed a motion for new trial, alleging that he was deaf, could not hear the proceedings, and did not receive "adequate hearing devices," thereby depriving him of the rights to "be confronted by his accusers," "fully understand the nature of the proceedings," and "take part in his own defense."

At a hearing on the motion, Jackson testified that he has an 82.5 percent hearing loss and completed a sign language course. He was not fluent, but could understand sign language when used slowly. He received an award for his ability to work despite his inability to hear without hearing aids. During voir dire, he could not hear the panel's responses. When using the headphones, he could hear the witnesses, but could not hear the testimony of the sexual assault nurse examiner when she turned to draw diagrams on the board, the testimony of witnesses when the microphones went out, or a video that had been played. He received headphones on the second day of trial.

On cross-examination, Jackson told the prosecutor that he could not hear her, that she needed to speak slowly so he could read her lips, and that the "high pitch" of her voice caused him to have trouble hearing. When asked, Jackson later told the prosecutor, who was using a microphone, that he could hear her because she was close to him and he was reading her lips. He admitted that he had appeared before the trial court several times before trial, including arraignment and pretrial hearings. He

claimed that, during his bail hearing, he advised the trial court of his hearing problems. He had not previously informed the trial court of his 82.5 percent hearing loss, but explained that he had not been asked. Even after receiving the headphones, he told his attorney that he was having problems hearing and his attorney expressed his own hearing difficulties. They informed the judge who instructed them to tap on the microphones to make them "work properly." He did not tell the trial court of the need for an interpreter, but explained that he cannot "understand sign very fast." Neither did he ask for any form of writing regarding the witnesses's testimony.

On redirect, Jackson stated that his previous court appearances took place at the bench, which enabled him to read the judge's lips. On re-cross, Jackson stated that he can hear with his hearing aids when he is "out in the open where there's not so much of this bouncing around in a room with background noise."

The prosecutor testified that for the first time during a break, Jackson advised the trial court of his hearing problems. The trial court offered to search for a hearing device to plug into the sound system. Upon return from the break, the trial court told Jackson that he would have to contact someone to obtain a hearing device. Defense counsel did not object to proceeding with voir dire until a device could be obtained. When the device was provided, the trial court inquired as to whether Jackson could hear and the defense confirmed that he could hear fine. The defense made no other indications that Jackson was having trouble hearing.

The trial court placed his own recollection on the record, which he subsequently detailed in findings of fact and conclusions of law. The trial court's findings of fact state

that: (1) before trial, it was not advised of Jackson's hearing impairment, testimony regarding an impairment was not presented, and it was not apparent that Jackson had any difficulty hearing; (2) in the morning on the first day of trial, defense counsel advised the trial court that Jackson was having trouble hearing; (3) defense counsel did not object to proceeding until a hearing device could be obtained; (4) during lunch, Jackson received a set of headphones attached to an audio device plugged into the sound system and indicated that "he could hear fine"; (5) Jackson used the device during the remainder of trial; (6) it was not apparent that Jackson had any further trouble hearing and there were no additional objections on the issue; and (7) Jackson "appeared to confer with his attorney during the trial without difficulty and thus it was not apparent to the Court that he had difficulty hearing during the rest of the trial."

The trial court's conclusions of law state that: (1) the trial court "devised a suitable remedy" to which Jackson and his counsel agreed; and (2) Jackson was not denied due process, the opportunity to confront witnesses, the "right to participate in his trial or the ability to understand the proceedings in his case." The trial court denied Jackson's motion.

On appeal, Jackson argues that he qualifies as a "deaf person;" thus, the trial court was required to either provide an interpreter or, if the defendant is unable to understand sign language, "fashion a remedy suitable to overcome the defendant's disability." Despite the provided headphones, Jackson maintains that he could not hear "essential portions" of the trial.

A trial court must provide an interpreter for a deaf person. *See* TEX. CODE CRIM. PROC. ANN. art. 38.31(a) (Vernon Supp. 2008). "The statute implements the constitutional right of confrontation, which includes the right to have trial proceedings presented in a way that the accused can understand." *Salazar v. State*, 93 S.W.3d 339, 340 (Tex. App.—Texarkana 2002, pet. ref'd). If the defendant cannot understand sign language, the trial court must "fashion a remedy suitable to overcome the defendant's disability." *Lincoln v. State*, 999 S.W.2d 806, 809 (Tex. App.—Austin 1999, no pet.). "A defendant's failure to object or request relief does not waive his confrontation right if it is otherwise apparent that he cannot hear or understand the proceedings." *Id.*

In *Lincoln*, Lincoln argued that the trial court failed to "make proper accommodations for his hearing impairment," depriving him of his right to confront witnesses and right to an interpreter. *See id.* at 807. Lincoln was not deaf, but had difficulty hearing. *Id.* at 809. During trial, he advised the trial court of this problem. *Id.* The trial court allowed Lincoln to move or the "speakers repeated themselves to permit [Lincoln] to hear." *Id.* Lincoln "did not indicate at the time that these arrangements were unsatisfactory." *Id.* He was also "addressed by the court and responded appropriately, indicating that he heard and understood what was said," and "twice took the stand and testified without difficulty." *Id.* at 809-10. Only after trial ended did Lincoln tell the trial court that he could not hear much of the time. *Id.* at 810.

Because the trial court observed Lincoln throughout trial, it was in the "best position to judge the credibility of [Lincoln's] claim that he did not hear the proceedings." *Id.* "While the failure of appellant or his attorney to tell the court earlier

that appellant could not hear the proceedings is not a bar to raising the issue on appeal, it is relevant to the question whether the district court knew or should have known that additional remedies were needed." *Id*. The Austin Court held that, "[c]onsidering what the district court was told and observed during the trial, we are not persuaded that the court failed to take constitutionally adequate steps to assure that [Lincoln] heard and understood the proceedings." *Id*.

In *Salazar*, Salazar complained that "when it became apparent he could not hear the witnesses because of his hearing impairment, the court was required to provide him an interpreter or some other means of communication that would permit him to participate in the proceedings." *Salazar*, 93 S.W.3d at 340. However, "Salazar was addressed by the court or by counsel and responded appropriately, indicating that he heard and understood what was said." *Id*. at 341. Not until the victims finished testifying did Salazar tell the trial court that he could not hear the testimony. *See id*. "Until then the trial judge had every reason to believe Salazar was able to understand the proceedings and testimony, and no reason to the contrary." *Id*. Thus, the trial court "could not be expected to take action to ensure that the testimony's content was effectively communicated to Salazar." *Id*. Because the trial court was in the best position to judge the credibility of Salazar's complaint, the Texarkana Court was "not persuaded [that] the court failed to take constitutionally adequate steps to ensure Salazar heard and understood the proceedings." *Id*.

Jackson briefly testified outside the jury's presence as to proceeding or resting his case. His attorney asked to be informed if Jackson could not hear him. The record

indicates that Jackson did not have difficulty testifying, but responded appropriately and appeared to hear and understand what was being said.

Jackson had also appeared before the court on several occasions before trial and never indicated that he could not hear or understand what was being said. Once Jackson advised the trial court of his hearing difficulties, the trial court provided the set of headphones connected to the sound system. According to the record, this was done before voir dire. The trial court asked the defense if the device satisfied Jackson and counsel responded that Jackson could hear fine. He did not indicate either at that time, or any other time, "that these arrangements were unsatisfactory." *Lincoln*, 999 S.W.2d at 809. Thus, the trial court had every reason to believe that Jackson could hear and understand the proceedings and, without information to the contrary, could not be expected to take any other action. Only after trial ended did Jackson inform that trial court of his 82.5 percent hearing loss or his inability to hear portions of the proceedings. His failure to inform the trial court, at an earlier time, that he could not hear the proceeding, is relevant to the whether the trial court knew or should have known of Jackson's need for "additional remedies." *Id*.

Having observed Jackson throughout trial, the trial court was in the "best position to judge the credibility of [his] claim that he did not hear the proceedings." The record does not indicate that the trial court "failed to take constitutionally adequate steps to assure that [Jackson] heard and understood the proceedings." *Lincoln*, 999 S.W.2d at 810; *see Salazar*, 93 S.W.3d at 341. We overrule issue three.

Because we have overruled Jackson's three issues, we affirm the judgment in each of the six cases listed above.

FELIPE REYNA
Justice

Before Chief Justice Gray,
        Justice Vance, and
        Justice Reyna
Affirmed
Opinion delivered and filed September 3, 2008
Do not publish
[CRPM]